Docusign Envelope ID: B3062018-712F-4852-92A7-217BCB7DC2B0

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HEATHER MCPHEE, | ) |
|             *Plaintiff*, | ) |
| v. | ) Case No.: 1:25-cv-04409 (AHA) |
| NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION, et. al. | ) |
|             *Defendants*. | ) |

### DECLARATION OF HEATHER MCPHEE

Pursuant to 28 U.S.C. § 1746, I, Heather McPhee, hereby declare as follows:

1. I am over 18 years of age and competent to give this declaration. This declaration is based on my personal knowledge, information, and belief.

2. Prior to December 30, 2025, I served as Associate General Counsel of the National Football League Players Association ("NFLPA" or "Union").

3. On December 18, 2025, I filed a four-count Complaint in the above-captioned case alleging (1) Obstruction of Justice in violation of 42 U.S.C. § 1985(2); (2) Sex Discrimination in Violation of the D.C. Human Rights Act, D.C. Code § 2-1401, *et seq.*; (3) Intentional Infliction of Emotional Distress; and (4) Breach of Contract.

**OTP Documents**

4. OneTeam Partners LLC (OTP) is a joint venture company that was originally formed in 2019 by the NFLPA, Major League Baseball Players Association (MLBPA), and a private equity company; after its creation, several other professional sports unions joined. OTP generates massive revenue from the group licensing of players' name, image, and likeness rights.

5. The NFLPA maintains an ownership stake in OTP and controls four of the nine seats on OTP's Board. The other Board seats are controlled by the MLBPA (three seats), the other professional sports unions (share one seat), and the private credit debt holders (share one seat). NFLPA union members are the largest owners of OTP.

6. I never provided legal advice or guidance to OTP, nor did OTP ever seek legal advice or guidance from me. There has never been an attorney-client relationship between me and OTP, nor am I aware of a perception by others that an attorney-client relationship existed between me and OTP.

7. In 2023, OTP instituted a new management incentive plan, which was called the Senior Executive Incentive Plan ("SEIP").

8. In June 2024, the labor union representatives on the OTP Board voted to indirectly grant themselves SEIP units by approving grants to the union owners of OTP in allocations that match the number of individual Board seats held by each union (the "Written Consent").

9. I did not learn about the existence of the SEIP or the Written Consent until November 2024. Neither Tom DePaso, the NFLPA's General Counsel, nor anyone else at the NFLPA sought my legal advice on the creation and adoption of the SEIP in 2023 or the Written Consent in June 2024.

10. After I learned in November 2024 about the creation of the SEIP and the Written Consent, I requested that an attorney at the NFL Players Inc. ("NFLPI"), the for-profit subsidiary owned and controlled by the NFLPA, send me documents including the OTP Board materials, the SEIP documents, Written Consent, and other relevant documents (collectively, "OTP documents").

11. Tim Slavin, OTP's Chief Legal Officer, provided those OTP documents to the NFLPI attorney, who then forwarded them to me.

12. The documents and communications received from OTP never indicated that OTP was providing the OTP documents subject to attorney-client privilege or a common-interest privilege agreement, and I was never otherwise informed of any applicable privilege or agreement.

13. Upon reviewing the OTP documents, I became concerned about the ▮▮▮▮▮ ▮▮▮▮▮ and Written Consent were not in the best fiduciary interest of the NFLPA union owners of OTP.

14. In early December 2024, public reports emerged that whistleblowers from the MLBPA had gone to the government with concerns about actions of the MLBPA representatives on the OTP Board regarding "equity grants," referring to the SEIP and Written Consent.

15. Based on my review of the non-privileged OTP documents and the public reports, ▮▮▮▮▮▮▮▮▮▮

16. While I was worried about ▮▮▮▮▮▮▮▮▮▮, I had no reason to anticipate that litigation regarding the issue was imminent. I was not aware of any demand letters, discussions of lawsuits, or other indicia that often occur before litigation is initiated. In fact, my sincere hope was that by raising the issues, and engaging with the other union OTP Board members, ▮▮▮▮▮▮▮▮▮▮

3

**Linklaters Investigation**

17. While [REDACTED] the NFLPA eventually retained outside counsel, Linklaters LLP, to conduct an investigation into OTP issues and processes.

18. In mid-December 2024, [REDACTED]

19. During the period of December 2024 and January 2025, Howell [REDACTED]

20. During the time period of the Linklaters investigation, in January/February 2025, a third party wrote to Mr. DePaso and me that he had learned of unauthorized "off-the-record" communications between Sean Sansiveri, CEO of OTP, to media members and NFLPA Executive Committee members about the Linklaters investigation.

21. After Mr. DePaso and Linklaters abruptly ended the investigation, Mr. Howell told me that [REDACTED]

22. During a meeting at the Linklaters office in April 2025, [REDACTED]

4

23.     ██████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

24.     By mid-March 2025/early April 2025, ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

25.     Mr. Sansiveri's comments indicate that Mr. Sansiveri, who was not an NFLPA employee, had been told the conclusions of the Linklaters investigation.

26.     For the period during and shortly after the Linklaters investigation, I had no reason to believe that litigation was imminent. Again, I was not aware of any demand letters, discussions of lawsuits, or other indicia that often occur before litigation is initiated.

**Collusion Arbitration Proceeding**

27.     After NFLPA union members initiated a grievance action alleging NFL team owners colluded to restrain NFL players' wages, an arbitrator issued a 61-page, non-confidential decision in January 2025.

28.     Despite the arbitrator making powerful findings that were favorable to the players, the NFLPA agreed with the NFL to keep the decision from the union members, including the three quarterbacks who went through the arbitration proceeding.

29.     In June 2025, journalists published the arbitration decision and questioned why the NFLPA hid it from its members.

30.     I communicated to others at the NFLPA that ████████████████████

████████████████████████████████████████████████████

5

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

31. After I voiced these concerns, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬

32. DeMaurice Smith was not affiliated in any way with the NFLPA at the time of that conversation and was not serving as counsel to the NFLPA.

**Notice of Termination**

33. On December 30, 2025, I received a Notice of Termination from the NFLPA. This Notice was sent mere hours before the NFLPA filed its Motion to Seal Portions of Complaint and the declaration of Tom DePaso.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this 20th day of January, 2026.

Signed by:
*Heather McPhee*
1EF4332AECB0463...
Heather McPhee

6