**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **HEATHER MCPHEE,**<br>317 ½ Constitution Ave. NE<br>Washington, DC 20002<br><br>***Plaintiff*,**<br><br>**v.**<br><br>**NATIONAL FOOTBALL LEAGUE PLAYERS ASSOCIATION,**<br>1133 20th St. NW<br>Washington, DC 20036<br><br>**MATTHEW CURTIN,**<br>1133 20th St. NW<br>Washington, DC 20036<br><br>**THOMAS DEPASO,**<br>1133 20th St. NW<br>Washington, DC 20036<br><br>**LLOYD HOWELL,**<br>18555 Collins Ave., Apt 3303<br>Sunny Isles Beach, FL 33160<br><br>***Defendants*.** | ) | **Case No.: ___________**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

1. This is an action arising from Defendants' unlawful and shameful conspiracy to intimidate and obstruct Plaintiff Heather McPhee, a senior female attorney at the National Football League Players Association ("NFLPA"), from cooperating with a federal investigation into misconduct and breaches of fiduciary duty by men in positions of power at that labor organization.

2. Ms. McPhee brings this action to demand accountability for these individuals who have prioritized their own financial and professional interests above their fiduciary duties and legal obligations to the player-members of the NFLPA.

3. The NFLPA is the largest owner of One Team Partners LLC ("OTP" or the "Company"), a joint venture company with the Major League Baseball Players Association ("MLBPA") and several other professional sports unions. OTP generates massive revenue from the group licensing of players' name, image, and likeness rights; in 2022, it was valued at $2 billion.

4. The NFLPA has four seats on OTP's Board. Those NFLPA designees are representatives of the labor union and therefore are charged with a fiduciary duty to act in the best economic interests of the union's player-members. In other words, they have a legal, fiduciary, and moral obligation to safeguard the NFLPA player-members' interest in this massively important asset.

5. [redacted]

[redacted] Moreover, the SEIP specifically subordinates payments to the NFLPA to certain SEIP participants.

6. In early December 2024, Ms. McPhee learned from media reports that whistleblowers from the MLBPA (OTP's second-largest owner) had reported similar legal concerns about "equity grants" at OTP (e.g., the SEIP) to the federal government.

7. After Ms. McPhee raised these concerns, the NFLPA retained outside counsel to conduct an investigation of the SEIP grants and the conduct of the NFLPA's representatives on the OTP Board. [redacted] No corrective actions regarding the SEIP grants to the unions or the SEIP itself was taken at the conclusion of the NFLPA's investigation.

8. Ms. McPhee, however, refused to disregard her duties to the NFLPA's union members. [redacted]

9. In April 2025, OTP, under the leadership of its compromised CEO Sansiveri, made baseless and ultimately disproven allegations that Ms. McPhee had disparaged OTP and the NFLPA.

10. Angry that Ms. McPhee continued to work to expose his wrongdoing, and that of other NFLPA and OTP executives, Howell directed Ms. McPhee to cease all work on issues related to OTP, threatening her with employment consequences if she failed to comply.

11. In May 2025, lawyers from the Department of Justice ("DOJ") contacted Ms. McPhee and asked if she would cooperate with a DOJ investigation into the conduct of certain executives of the NFLPA and its subsidiaries relating to OTP. Ms. McPhee agreed to cooperate as appropriate in that investigation.

12. On May 30, 2025, Ms. McPhee reported to the NFLPA's Board of Player Representatives and Executive Committee that the DOJ was investigating Howell and other senior NFLPA executives related to, at least, their conduct in connection with OTP, and that the DOJ had contacted her as a witness.

13. Around this time, Howell and DePaso learned that Ms. McPhee had agreed to serve as a witness in the DOJ and grand jury investigations.

14. Shortly thereafter, Ms. McPhee was prohibited from communicating with the NFLPA Board or the Executive Committee about the investigations.

15. DePaso, Curtin, and Howell complained that Ms. McPhee was not "on [their] team" and a colleague noted that she was "put out on an island." Howell reportedly told the NFLPA's Executive Committee that Ms. McPhee "is a problem and we will deal with it."

16. Also in early 2025, Ms. McPhee learned that Howell and DePaso had agreed with the NFL to conceal from NFLPA members, and failed to immediately appeal, a non-confidential arbitration decision that cited evidence of collusion between the NFL Commissioner, the NFL's General Counsel, and multiple team owners to avoid giving players fully guaranteed contracts. This agreement to withhold the arbitrator's decision from all union members for six months

appeared to violate union members' rights under the Collective Bargaining Agreement, and it raised concerns about a potential violation of the NFLPA's duty of fair representation to players. The rights of union members, including those who were free agents in 2025, to have the decision and use it as leverage in their contract negotiations, were frustrated by the NFLPA's agreement with the NFL to hide it from them. DePaso, meanwhile, sought to undermine Ms. McPhee as "making trouble," and "too intense and emotional."

17. As scandal swirled, Howell resigned as the NFLPA's Executive Director in July 2025. David White was appointed Interim Executive Director on or around August 3, 2025.

18. Ms. McPhee was scheduled to meet with White on August 13 to introduce herself and provide a summary of the serious issues facing the NFLPA, including the OTP's SEIP and the NFLPA's concealment of the collusion decision. Curtin, DePaso, and others desperately wanted to prevent that meeting from happening.

19. In the afternoon of August 12, White asked if Ms. McPhee could meet with him that afternoon instead. When Ms. McPhee arrived for her rescheduled meeting with White, he handed her a memorandum notifying her that she was being placed on paid administrative leave in connection with a purported investigation into complaints about her "workplace behavior." The NFLPA forbade Ms. McPhee from entering the NFLPA's offices, performing any work for the NFLPA, or having contact with NFPLA employees, Executive Committee members, Board members, and current or former union members, among others. She was immediately cut off from her work email and other internal systems.

20. The threats to Ms. McPhee's livelihood, combined with the conditions of Ms. McPhee's administrative leave, were designed to intimidate and otherwise prevent her from cooperating with DOJ and grand jury investigations.

21. The memo that White provided to Ms. McPhee contained only the vaguest of allegations, and it contained no information about the substance of those allegations, who made them, when the alleged conduct took place, or the specific policies she allegedly violated.

22. Someone leaked the memo to the press almost immediately, apparently seeking to discredit and further intimidate Ms. McPhee. Within days, the media had identified Matt Curtin as someone who had complained about Ms. McPhee. Around this same time, Curtin bragged to personnel at OTP that he had "ordered the Code Red" on Ms. McPhee, illustrating the pretextual, discriminatory, and retaliatory nature of the NFLPA's actions.

23. Over the next several months, the retaliatory and obstructive nature of the investigation was readily apparent. The NFLPA, through counsel, refused to provide any further details about the allegations against Ms. McPhee, making it impossible for her to defend herself from the pretextual and baseless claims. The NFLPA also repeatedly demanded that Ms. McPhee allow its attorneys to forensically image her personal cell phone, which it had never done with any other employee, including men under investigation for serious financial and/or sexual misconduct.

24. The Defendants' wrongful actions against Ms. McPhee have caused her reputational harm, economic damage, physical injury, and emotional distress that is ongoing.

25. For sixteen years, Ms. McPhee dedicated her intellect, heart, and countless hours to working in the best interests of the young athletes who are the members of the NFLPA. It pains Ms. McPhee that these young union members have been so ill-served in recent years by men willing to disregard fiduciary duty and labor laws in service to their own self-enrichment. Those individuals are now targeting Ms. McPhee in order to conceal and deflect from their own misconduct and failures.

## PARTIES

26. Plaintiff Heather McPhee is a resident of the District of Columbia. She has served as Associate General Counsel of the National Football League Players Association since August 11, 2009. She is the senior female attorney at that organization and serves as its internal expert on legal risk management, strategy, and compliance.

27. The National Football League Players Association ("NFLPA") is a labor organization serving as the exclusive bargaining representative for approximately 1,900 professional football players employed by NFL teams. As a labor union, the NFLPA is subject to federal labor laws. The NFLPA maintains its principal place of business in Washington, D.C.

28. The NFLPA's player-leadership consists of the Board of Player Representatives (the "Board") and the Executive Committee ("EC"). The Board is comprised of 32 player representatives, one from each NFL team, elected by their teammates, who vote on behalf of the union members on their team. The EC is comprised of the President, Treasurer, and nine Vice-Presidents; EC members do not have voting power on the Board unless a member of the EC is also his team's player representative.

29. Matthew Curtin is President of the NFL Players, Inc. ("NFLPI") and serves on the Board of Directors of One Team Partners, LLC. He is sued in his individual capacity for his role in discriminating against Ms. McPhee and in orchestrating retaliation against her.

30. Tom DePaso is the General Counsel of the NFLPA. He is sued in his individual capacity for discriminating against McPhee and in facilitating and participating in the retaliatory campaign against her.

31. Lloyd Howell served as Executive Director of the NFLPA from June 28, 2023, until his resignation in July 2025 in the wake of multiple scandals, including use of union funds

to patronize strip clubs, participation in a scheme for self-enrichment, conflicts of interest with an entity seeking investment in an NFL team, and agreeing to suppress union members' rights. Prior to employment at the NFLPA, he was the Chief Financial Officer of Booz Allen Hamilton during a period for which the company, facing allegations of massive procurement fraud, paid the United States more than $377 million to escape False Claims Act allegations. He is sued in his individual capacity for discriminating against McPhee and in initiating and directing retaliation against Ms. McPhee.

## JURISDICTION AND VENUE

32. Pursuant to 28 U.S.C. § 1331, the United States District Court for the District of Columbia is the proper jurisdiction for this action because Ms. McPhee's claim for conspiracy to obstruct, intimidate, and deter her from providing witness testimony in Department of Justice and federal grand jury investigations arises under a federal statute, 42 U.S.C. § 1985(2).

33. Pursuant to 28 U.S.C. § 1367, this Court has supplemental jurisdiction over the remaining claims because all claims asserted in this action are closely related and form part of the same case or controversy.

34. Pursuant to 28 U.S.C. § 1391, the District of Columbia is the appropriate venue for this action because a substantial part of the events giving rise to the claims occurred in the District of Columbia.

## FACTUAL BACKGROUND

### I. Ms. McPhee's Professional Background and Tenure with the NFLPA

35. Ms. McPhee is a high honors graduate of Princeton University and the University of Chicago Law School, and former doctoral fellow at Harvard. From 2000 to 2006, she practiced law in the D.C. office of the prominent national law firm Latham & Watkins LLP,

where she worked on a range of corporate litigation, risk management, regulatory, and white-collar matters. From 2006 to 2009, she continued building her practice at another prestigious law firm in Washington, DC, Patton Boggs LLP.

36. While at Latham and Patton Boggs, Ms. McPhee worked closely with partner DeMaurice Smith. Smith was selected as the Executive Director of the NFLPA in March 2009. Smith asked Ms. McPhee to come with him as one of the union's in-house attorneys.

37. Ms. McPhee accepted Smith's offer and joined the NFLPA as Associate General Counsel on August 11, 2009. She was the first female attorney to join the NFLPA's legal department staff.

38. Ms. McPhee devoted herself to mastering the complex tapestry of laws and regulations that govern labor management-relations and labor organizations, including the Labor Management Relations Act and the Labor Management Relations Disclosure Act ("LMRDA"). She also studied the various government entities that play crucial roles in the labor law ecosystem, including the Department of Labor, the Office of Labor Management Standards, the National Labor Relations Board, and the Federal Mediation and Conciliation Service. Ms. McPhee quickly learned that key principles and requirements animating labor laws include transparency, fiduciary duty in management of union members' assets, and prohibitions on conflicts of interest and self-dealing by labor organization employees, officers, and representatives.

39. The LMRDA reflects a comprehensive framework of union members' rights, financial transparency requirements, and safeguards designed to protect union members' interests from potential harm by self-interested or corrupt employees and leadership. Union employees and officers must act as fiduciaries for union members' assets and are obligated to

meet elevated legal duties to union members. The duty of loyalty requires acting in the financial best interests of union members and includes avoiding conflicts of interest and self-dealing. The duty of care requires that fiduciaries are thoroughly informed when making decisions on behalf of union members; fiduciaries must rigorously assess information with a critical eye. And the duty of good faith requires honest and honorable intentions, devoid of self-interest and conflicts of interest.

40. The first fourteen years of Ms. McPhee's work as NFLPA Associate General Counsel occurred under the leadership of Executive Director DeMaurice Smith. Immediately upon her arrival, she began serving on the NFLPA staff leadership team, which had regular meetings and calls with the NFLPA's player-leaders. The purposes of this routine involvement of the leadership team was to ensure that the union's player-leaders had regular interactions with numerous experienced professional personnel, including lawyers with different areas of expertise, who provided them with a broad range of guidance, advice, and ideas. Importantly, the presence of numerous staff with ranges of expertise on the leadership team and in regular meetings and communications with player-leadership ensured that information and advice that was transmitted to player-leaders was heard, vetted, and opined on by numerous senior staff, which prevented transmission of inaccurate, misleading, incomplete, or false information to players.

41. Throughout the time she served under Smith, Ms. McPhee was the primary union attorney for the key strategic external litigation cases and many of the high-profile player discipline matters. Upon her arrival at the NFLPA in 2009, Ms. McPhee also served as the internal risk transfer and management expert who created financial protections for union members and their assets. During the historic 2011 lockout of players by the NFL owners, Ms.

McPhee and expert outside counsel built the world's first "lockout" insurance policy, securing hundreds of millions of dollars from carriers to pay players if the NFL owners' lockout extended into the playing season and deprived players of wages. Over the next several years, Ms. McPhee's risk transfer expertise resulted in building a portfolio of $70 million in risk transfer (insurance) coverage to protect the union members' increasingly massive assets from management liability exposures to the labor organization.

42. The NFLPA General Counsel Tom DePaso has worked at the NFLPA for over forty years; it is the only place he has practiced as a lawyer. Over his career at the NFLPA, beginning as staff counsel, DePaso developed deep knowledge of player grievances, as well as accounting and related salary-cap issues, specific to the collective bargaining agreements between the NFLPA and the NFL. However, DePaso has no corporate, litigation, compliance, risk transfer, investigations, or any other private law firm experience. During Executive Director Smith's tenure (i.e., through 2023), DePaso was not significantly involved with areas of responsibility including organizational risk management, investment committee oversight, business strategies of NFLPI, corporate Board policies and best practices, or the creation of OTP. Consequently, Ms. McPhee possesses a much greater understanding than DePaso of how those complex financial aspects of the labor organization's operations intersect with labor law, especially the fiduciary duties owed to members' assets.

## II. Executives From OTP and the NFLPA Scheme to Enrich Union Members' Representatives on the OTP Board Through the Senior Executive Incentive Plan (SEIP)

### A. The NFLPA and Others Create One Team Partners, LLC ("OTP") to Commercialize Athletes' Group Licensing Rights

43. NFLPI is a wholly controlled for-profit subsidiary of the NFLPA, responsible for group licensing and marketing activities using union members' names, images, and likenesses ("NIL"). NFL player-members contractually delegate their group licensing rights of their NIL to the NFLPI via the Group Licensing Agreement. The revenue generated by the group licensing of members' NIL has been robust for many years, enabling annual payments to all qualifying union members and payment of the operating costs of the NFLPA/NFLPI.

44. Matt Curtin was appointed President of NFLPI by former NFLPA Executive Director Lloyd Howell in February 2024. There was no professional executive search process to fill this position (unlike all prior instances when the position was open). Howell simply appointed his friend Curtin, despite Curtin having no prior labor organization or licensing or marketing business experience.

45. The NFLPA members' union assets include their ownership interest in OTP. OTP is a joint venture initially formed in 2019 by the NFLPA, the MLBPA, and RedBird Capital Partners. At OTP's inception in 2019, the NFLPA contributed its exclusive trading card and video game rights (along with other non-exclusive categories) in exchange for 40% of the Company, an upfront rights fee, and a royalty on all revenue generated.

46. OTP is the first company directly owned by players' unions that commercializes athletes' group licensing rights across sports. OTP aggregates certain valuable group licensing

rights of professional athletes via their unions, and it participates in several additional business lines that the individual union subsidiaries could not pursue on their own.[1]

47. OTP was restructured in 2022 when RedBird Capital Partners, the original private equity investor, exited. At that time, OTP was valued at approximately $2 billion.

48. After the 2022 restructuring, the NFLPA members are the largest owner (44.5%) of OTP.

49. There are nine OTP Board seats for the equity owners of the Company. There are no independent Board seats.

50. The NFLPA has four (4) of the nine (9) seats on the OTP Board; MLPBA has three (3) seats; smaller unions share one (1) seat; and the private credit debt holders share one (1) seat. The individuals serving in the NFLPA seats on the OTP Board are all representatives of the labor union and therefore have a fiduciary duty to act in the best economic interests of the union's player-members.

51. The NFLPA's current OTP Board members are the Interim Executive Director of the NFLPA, David White; President of NFLPI, Matt Curtin; and Bruce Daitch (a non-NFLPA/NFLPI employee and personal friend of Sansiveri). One of the NFLPA's OTP Board seat representatives, Jamie Rubin recently resigned due to his concerns about management and certain Board actions, and on information and belief, that seat is currently unoccupied.

52. Pursuant to the OTP Limited Liability Corporation Agreement ("OTP LLCA"), the Executive Director of the NFLPA also serves as the Lead Manager/Chairman of the Board of

[1] Since its inception, additional players associations have joined OTP including Major League Soccer Players Association ("MLSPA"), Women's National Basketball Players Association ("WNBPA"), U.S. Women's National Team Players Association, and U.S. Rugby Players Association.

OTP. Currently, however, the Executive Director of the NFLPA, David White, is serving on an interim basis. NFLPI President Matt Curtin sought and received appointment as the interim Lead Manager of OTP at an OTP Board meeting on August 14, 2025.

53. The formation of OTP was overseen by then-NFPLA Executive Director DeMaurice Smith; then-President of NFLPI, Ahmad Nassar (who is also an attorney); and outside counsel at Latham. Careful attention to the unique legal fiduciary duties owed by the NFLPA representatives on the OTP Board was reflected in the OTP corporate documents. The OTP LLCA reflects, for example, that the duties of each union's OTP Board representatives are ultimately owed to that union's members, period.

B. Sansiveri Leads Creation of a New Senior Executive Incentive Plan Designed to Benefit Certain Executives and Subordinate Union Members' Interests

54. In early June 2023, OTP hired two new executives, Sean Sansiveri as CEO and Frank Arthofer as President. Prior to that, Sansiveri had been a lawyer at the NFLPA and NFLPI for approximately 10 years (most recently as General Counsel of NFLPI), and he had worked closely on OTP matters with Smith and Nassar. (Arthofer had no prior connections to any of the unions that own OTP.)

55. On June 29, 2023, a few weeks after the announcement that Sansiveri had been named the next CEO of OTP, Lloyd Howell was elected as the Executive Director of the NFLPA and thus became one of OTP's Board members.

56. While he was a lawyer at NFLPI, Sansiveri worked closely with outside counsel, as well as Smith and Nassar, on the 2022 restructuring of OTP. Upon information and belief, during this process Sansiveri developed detailed knowledge of both the original and new structures of OTP, including its revenue flows and corporate governance structures, as well the original Management Incentive Plan (MIP) that had been formed at the inception of OTP.

57. The MIP was created, negotiated, and drafted with each of the expert outside counsels for the NFLPA, the MLBPA, RedBird Capital, and OTP, respectively. The MIP was a profits interest plan designed to reward executives for their work increasing the value of the Company. The employees of OTP are not employees or representatives of labor organizations, and there is nothing inappropriate or illegal about the existence of MIPs for a private company.[2] The original OTP executives had no role in negotiating the terms of the MIP.

58. At the time of the restructuring of OTP in 2022, departing executives with vested MIP units could realize the value of that part of their compensation. OTP was originally valued at $275 million in December 2019, and the valuation adopted by the Board at the time of the restructuring was $2 billion. The value of the MIP units recognized that exponential value growth of the Company; certain executives earned several million dollars.

59. After Sansiveri was selected as the next CEO of OTP in June 2023, he remained employed as the General Counsel of the NFLPI until September 2023. During that time, he was an employee of the labor organization. In July and August 2023, while he was still an employee of the NFLPA/NFLPI, Sansiveri personally retained an expert compensation lawyer and initiated the formation of an entirely new management incentive plan at OTP, called the Senior Executive Incentive Plan ("SEIP"). Sansiveri's personal lawyer drafted and negotiated a long form binding term sheet for a new SEIP at OTP.

60. Grants of units from the SEIP are forms of compensation intended to incentivize the Company executives to increase the value of the Company. Members of the NFLPA do not

[2] Such plans can also allow for the grant of units to non-employees who provide value to the company if the plan allows for and the Board votes to approve such allocations. Certain non-OTP employees and *non-labor organization representatives* who provided value to OTP had been granted MIP units.

directly benefit from the granting of SEIP units; indeed, an increase in allocated units of the Company dilutes the value of the units owned by the NFLPA members. Such compensation plans are intended to provide an indirect benefit to the Company owners by attracting talented executives to the Company. Thus, the benefit to union members of attracting top executives must be expertly balanced against the disadvantage of diluting the value of their ownership of the Company.

61. The NFLPA members' expert corporate lawyers *were never made aware of the creation of the new SEIP*, and therefore no attorneys participated, negotiated, reviewed, or advised on behalf of the NFLPA members' interests in the creation of that very important economic aspect of the NFLPA members' asset. At the time, Ms. McPhee was not made aware that a SEIP was being contemplated and drafted for OTP. An NFLPA junior lawyer who worked directly for Sansiveri while he maintained both his OTP and the NFLPA/NFLPI roles, failed to understand the importance and complexity of the creation of the new incentive plan, and that lawyer did not contact the NFLPA's outside counsel to inform them of the creation of a new plan or engage them in the process to represent the NFLPA members' interests.

62. The SEIP contains unusual provisions such as "catch up provisions," "add backs," and "put rights" that function to benefit only certain SEIP participants (including Sansiveri), and do not benefit the union member owners of OTP. [redacted] Critically, the SEIP contains a provision which requires that *payments to the unions on behalf of their members are subordinated behind/after the "catch up" payments to the new OTP executives, Sansiveri and*

*Arthofer*. It is highly problematic that Sansiveri negotiated this provision while he was still an employee of the NFLPA/NFLPI with fiduciary responsibilities to union members.

63. The long form binding term sheet for the SEIP was developed into detailed SEIP documents over the next several months by counsel for Sansiveri, OTP, and the MLBPA. Yet even at this stage, the interests of the NFLPA's members, who are the largest owners of OTP, were not represented by counsel. The internal NFLPI lawyer who worked under Sansiveri failed to inform and engage the NFLPA/NFLPI's outside counsel at any point during this process.

64. Sansiveri is the largest SEIP participant, and, upon information and belief, stands to realize millions of dollars upon the first qualifying event in 2027.[3]

65. In December 2023, OTP Board members voted to adopt the new SEIP. The NFLPA representatives on the OTP Board at that time, none of whom were lawyers, voted to adopt a complex, extremely important economic part of OTP without having any legal review or advice on behalf of the players. A fundamental duty of fiduciaries is the duty of care, which requires that fiduciaries be thoroughly informed when making decisions on behalf of union members; fiduciaries must rigorously assess information with a critical eye. That duty could not have been met by the NFLPA's OTP Board representatives when they voted to adopt the SEIP documents.

---

[3] Upon information and belief, Sansiveri aggressively encouraged Howell in July 2023 to terminate NFLPA's exclusive trading card contract with Panini, which the NFLPA ultimately did. If that termination had been legitimate, a much larger trading card contract with Fanatics would have taken effect before March 1, 2026, increasing revenue at OTP, thereby increasing the likelihood that Sansiveri would reach the highest possible value of his SEIP units by 2027. However, Panini sued the NFLPA for improper termination of the contract and won. $7.8 million in damages was awarded to Panini and the NFLPA incurred another $7 million in legal fees for that disastrous decision. The NFLPA's act of terminating Panini has been cited in the multiple pending antitrust cases against the NFLPA and OTP.

66. In early 2024, OTP and the unions' OTP Board representatives began discussing the idea that the OTP Board representatives also should receive units in the SEIP.

67. OTP Board representatives are not OTP executives; they are there as labor unions' representatives whose legal duties are to advocate for maximizing their union members' economic interests, in this case their direct ownership of OTP. Service on the OTP Board is part of their jobs with (or volunteer service to) a particular labor union, and maximizing the performance of OTP on behalf of their union members' ownership interest is always their duty. Therefore, there is no aspect of their participation on the OTP Board on behalf of their union's members that needs to be "incentivized." Indeed, labor organization representatives are prohibited by federal law from receiving anything of value (e.g., SEIP units paid as cash upon a liquidating event) from an employer (e.g., OTP) where their judgment could be influenced.

68. Importantly, not every transaction or decision by or for OTP impacts all of the union owners in the same way. Thus, it is vital that each union's OTP Board representatives—who are fiduciaries for their union's members—advocate and fight for the specific terms on deals and Company decisions that will best serve their respective union members' interests. This is why the OTP's governing documents specifically reflect that unlike other corporate Boards, the OTP union Board members serve on the OTP Board to represent the best interests of their union members' ownership in the Company; their duties are to their union members' ownership interest rather than just to the Company overall.

69. [redacted]

70. Unbeknownst to Ms. McPhee, in June 2024, the OTP Board members voted to grant themselves SEIP units in an indirect manner instead. Under the approved plan (the "Written Consent"), OTP granted SEIP units to the unions that own OTP, in allocations that match the number of individual Board seats held by each union (e.g., four seats held by the NFLPA). The expectation was that when a SEIP payout occurs, the money would flow from OTP to union, which would then transmit the money—potentially hundreds of thousands of dollars—to the individual OTP Board members.

71. The communication in the months leading up to the Written Consent, in which OTP Board members and executives discussed granting units to "reward" the individuals occupying the unions' OTP Board seats, makes clear that the explicit goal of this action was to financially enrich the people serving on the OTP Board as labor union representatives.

72. Upon information and belief, as of the date of this filing, the Written Consent that approved the SEIP grants to the unions has not been revoked.

73. Payouts from the SEIP only occur under very specific circumstances (a "liquidating event," such as the payoff of credit debt holders), and on information and belief, no SEIP payouts to the unions has been triggered as of the date of this filing.

C. Ms. McPhee Warns About Legal Risks Presented by Granting Units from the SEIP to the Union for the OTP Board Representatives

74. In or around November 2024, Ms. McPhee first learned about the existence of the OTP SEIP and the OTP Board's Written Consent to grant SEIP units in order to compensate the NFLPA's OTP Board representatives. [redacted]

[redacted]

75. [redacted]

76. Over several months, [redacted], Ms. McPhee reviewed OTP SEIP documents[4] and researched the grant of units in the SEIP. [redacted]

77. Ms. McPhee raised these concerns [redacted] on multiple occasions beginning in approximately November 2024.

D. <u>The NFLPA Conducts [redacted] Investigation of the OTP SEIP Issues</u>

78. In early December 2024, the media reported that whistleblowers from the MLBPA had reported legal concerns to labor officials in the federal government about the Executive Director of the MLBPA, including concerns about "equity grants" to labor organization representatives on the OTP Board (i.e., the SEIP grants).[5] MLBPA members are the

---

[4] OTP provided these documents to the NFLPA for its review without any reservation of attorney-client privilege or common-interest privilege agreement. [redacted]

[5] https://awfulannouncing.com/mlb/whistleblower-mlbpa-charge-tony-clark-nlrb.html

second largest owners of OTP; MLBPA has three seats on the OTP Board. Ms. McPhee immediately shared this media report with DePaso.

79. [redacted]

80. In light of this public reporting, the NFLPA retained outside counsel, Linklaters LLP, to conduct an investigation of OTP issues. [redacted]

81. In early December 2024, Ms. McPhee requested a meeting with Howell and Curtin to discuss [redacted]

82. In mid-December 2024, Linklaters joined an OTP Board meeting and informed the Board members, including Howell and Curtin, that the NFLPA had retained his firm to investigate concerns regarding SEIP grants to the union. Linklaters also shared that there had been a media report that whistleblowers from the MLBPA had contacted the federal government about related concerns. The MLBPA Executive Director Tony Clark expressed his frustration and abruptly disconnected from the OTP Board meeting. Upon information and belief, Clark

subsequently communicated to Howell his extreme displeasure with both Howell and the investigation.

83. Following the December 2024 meeting, Clark and Howell began a pressure campaign to shut down a thorough review of the SEIP. OTP personnel reported that Howell was upset by the negative reactions of OTP Board members and felt he needed to "repair things" with them. [redacted]

84. During December 2024 and January 2025, OTP, through its General Counsel (Tim Slavin, who is a SEIP recipient) and outside counsel retained to respond to the NFLPA's investigation, repeatedly resisted Linklaters' requests for information. Howell also frequently complained about the investigation to people outside the NFLPA, claiming that the investigation was upsetting OTP Board members and hurting OTP's ability to conduct business. [redacted]

85. While the Linklaters investigation proceeded, Ms. McPhee continued independently studying the SEIP [redacted]

86. Around this time, Ms. McPhee became aware that Sansiveri had repeatedly spoken with third parties without authorization, including NFL players and the press, about the NFLPA's investigation. A third party wrote to DePaso and Ms. McPhee about Sansiveri's numerous communications to player-leaders and press criticizing and minimizing the NFLPA's

investigation. Sansiveri had communicated several times with the NFLPA Executive Committee members about the investigation and complained that Ms. McPhee was "making a big deal about nothing." During the events around the 2025 Super Bowl, Sansiveri repeatedly disparaged the investigation and blamed it on "Heather [McPhee] being intense." Sansiveri reportedly remarked to the NFLPA player-leaders that "she might be a genius, but there's a thin line between genius and crazy."

87. Neither DePaso nor Linklaters took action to stop, or even discourage, Sansiveri's conduct, which Ms. McPhee perceived as interference with the investigation and indicative of a desire to hide information and conduct that was problematic for OTP and the NFLPA officials. Ms. McPhee also realized that Sansiveri did not welcome rigorous analysis of the SEIP because he is the largest participant in the SEIP and thus has an enormous personal financial interest in the outcome of any investigation.

88. [redacted]

89. [redacted]

90. [redacted]

E. Ms. McPhee's Continued Analysis and Advocacy Concerning the SEIP is Met with Resistance

91. In spite of DePaso's inaction and apathy, as the NFLPA's internal lawyer with the most extensive corporate and labor law expertise and greatest mastery of the web of laws and regulations governing union representatives' fiduciary duties, Ms. McPhee refused to abandon her fiduciary duty to the union members.

92. In early April 2025, Ms. McPhee convened a virtual meeting with the NFLPA's outside corporate counsel at Latham, Curtin, Howell, DePaso, and a junior NFLPA lawyer, [redacted]

93. [redacted]

94. [redacted]

95. Ms. McPhee was stunned to receive this instruction. [redacted]

96. Ms. McPhee believed that DePaso's instruction was partially motivated by his desire to keep the peace with Howell. Four months earlier, in January 2025, DePaso had accepted a buyout offer from Howell.[6] As General Counsel, DePaso is among the highest paid NFLPA employees with long-term service, and he falls into the highest payout category under Howell's buyout plan: DePaso will receive $1.5 million when he departs in early 2026. This made DePaso essentially a "lame duck" General Counsel and gave him a personal financial interest in not confronting serious failures by Howell and his close "executive leadership" team members, including Curtin. DePaso was now financially motivated to keep his head down about Howell and his administration's misconduct and failures to act in the best interest of players. (Ms. McPhee did not accept the buyout offer from Howell).

97. [redacted], Ms. McPhee sought a meeting directly with Howell to elevate her concerns [redacted] This meeting occurred in mid-April.

98. Howell then informed Ms. McPhee that Sansiveri and OTP were upset with Ms. McPhee, and their outside counsel had written a letter to DePaso, copying Howell, accusing Ms. McPhee of disparaging both OTP and the NFLPA.

---

[6] In early 2025, Howell and his Chief Financial Officer made buyout offers to financially incentivize NFLPA/NFLPI employees with at least seven years of service to leave the organization. Howell authorized payments to long-term employees for twelve (12) to eighteen (18) months of their salary if they agreed to leave NFLPA/NFLPI. The scheme ensured that numerous employees, some with deep expertise and knowledge of union best practices, would leave the organization, making it much easier for Howell and his selected executives (including Curtin) to financially benefit themselves without scrutiny from union employees with the ability to identify and question improper conduct.

99. [redacted]

100. Ms. McPhee contacted a Linklaters attorney, who asked her to come to Linklaters' office to discuss it. Ms. McPhee then went to that attorney's office. Upon her arrival, he handed Ms. McPhee a hard copy of a letter from the outside counsel who had been representing OTP in its interactions with the NFLPA during its investigation. The first sentence of the letter thanked [redacted] for discussing the NFLPA's "audit" of OTP and "confirming that there were no problems found."

101. [redacted]

102. The Linklaters attorney then snatched the letter out of Ms. McPhee's hands and refused to let her read it any further. [redacted]

103. The Linklaters attorney then read the allegations in the letter to Ms. McPhee, which accused her of disparaging OTP, the NFLPA, Howell, and DePaso and claimed that she had discouraged other unions from joining OTP. Ms. McPhee denied the allegations, as she had done none of those things. The Linklaters attorney appeared flustered and reiterated that the NFLPA needed to see if there was any evidence supporting OTP's complaints about Ms. McPhee.

104. The following morning, Ms. McPhee received an email from Howell, [redacted] stating that she was to cease all work on anything related to OTP, and threatening her with employment consequences if she failed to comply. [redacted]

[redacted]

105. As of mid-May 2025, [redacted] no action to revoke the June 2024 Written Consent granting SEIP units to the union had occurred; no action to communicate with the other union representatives on the OTP Board had occurred; no action to address the egregious provisions in the SEIP, including subordinating the union's payments to those to Sansiveri and the other SEIP participants, had occurred. [redacted]

106. [redacted] OTP's allegations against Ms. McPhee had found no evidence of wrongdoing.

### III. The NFLPA Learns that Ms. McPhee Has Agreed to Cooperate with the DOJ as a Witness in Its Investigation into OTP

107. In mid-April, [redacted] Ms. McPhee learned that whistleblowers at the MLBPA had a lengthy meeting with the government officials investigating the MLBPA Executive Director, and the whistleblowers wanted to let the NFLPA know that the investigation was focused on OTP Board union representatives. Ms. McPhee was concerned for the NFLPA union members.

108. In mid-May 2025, the DOJ reached out to Ms. McPhee and asked if she would meet with them to share information for their investigation into the conduct of certain NFLPA/NFLPI executives relating to OTP. Ms. McPhee agreed to cooperate as appropriate.

109. Upon information and belief, the DOJ had convened a grand jury in connection with its investigation into the NFLPA.

110. On May 30, 2025, Ms. McPhee reported via email to the Board and to the EC that the DOJ was investigating Howell and other senior NFLPA executives related to the OTP Board ("Ms. McPhee's DOJ Investigation Disclosure"). Ms. McPhee also informed them that the DOJ had contacted her.

111. Howell and DePaso were aware that the DOJ contacted Ms. McPhee to be a witness in the investigations.

112. [redacted]

113. [redacted]

114. Ms. McPhee had presumed that the EC would want to learn details about conduct that led to the first federal investigation of the NFLPA in its history. [redacted]

115. Hours after Ms. McPhee's DOJ Investigation Disclosure, Ms. McPhee was prohibited from communicating with the Board. She was deeply troubled by that silencing directive.

116. Upon information and belief, by the first week of June 2025, DePaso had seen a copy of Ms. McPhee's DOJ Investigation Disclosure. DePaso remarked, "She's not on our team."

117. Upon information and belief, soon after Ms. McPhee sent the DOJ Investigation Disclosure, Howell stated on a call with Curtin and the EC that Ms. McPhee is "a problem and we will deal with it."

118. Howell and Curtin had a personal financial stake in ensuring that the Written Consent remained in place so that they would eventually get a lucrative pay-out indirectly through the OTP SEIP.

119. Upon information and belief, soon after Ms. McPhee sent the DOJ Investigation Disclosure, Howell told Sansiveri about efforts to isolate and silence McPhee; Sansiveri encouraged those efforts.

120. DePaso subsequently excluded Ms. McPhee from all communications with the EC and Board about the DOJ and grand jury investigations. Instead, he included a much less experienced, male attorney from Ms. McPhee's office. Ms. McPhee has professional respect for him, but he has about 15 years less experience than Ms. McPhee, and he lacks her high level of expertise in areas directly relevant to advising on the DOJ's and grand jury's investigations, including in crisis risk management and the complexity of the issues.

121. Around this time, the above-referenced colleague told Ms. McPhee she "had been put out on an island."

122. Ms. McPhee's DOJ Investigation Disclosure was leaked (by someone other than Ms. McPhee). On June 11, AwfulAnnouncing.com reported that it had received a copy of Ms. McPhee's email and that Ms. McPhee wrote that she had been contacted by "federal

investigators regarding the investigation into the activities of members of the union's leadership" and that "she was ordered to stop working on anything connected to OTP with the threat of employment discipline."[7] AwfulAnnouncing.com further reported that Ms. McPhee wrote about "serious questions about self-dealing and the competencies of OTP leadership" and that Ms. McPhee and the NFLPA's outside counsel WW&D were "alarmed."[8] The story also reported that Ms. McPhee "urged the executive committee to meet."[9]

123. That story was picked up by other news outlets, including NBC Sports.[10] On June 12, NBC Sports reported much of what AwfulAnnouncing.com had reported, including references to "whistleblower lawsuits" and "a potential whistleblower claim."[11]

124. Upon information and belief, this reporting gave some of Ms. McPhee's colleagues the mistaken belief that Ms. McPhee was a whistleblower with special protections, and several of them came to her with new information about misconduct.

125. Ms. McPhee elevated her colleagues' reports to DePaso. Upon information and belief, DePaso took no action in response.

## IV. The NFLPA Hides the Arbitration Decision Addressing Collusion Among NFL Teams from its Members in Violation of the Collective Bargaining Agreement

126. In October 2022, all the NFLPA union members initiated a grievance action alleging that NFL team owners colluded to restrain NFL players' wages.

---

[7] https://awfulannouncing.com/nfl/nflpa-lawyer-whistleblower-memo-fbi-probe-oneteam-partners.html
[8] *Id.*
[9] *Id.*
[10] https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/nflpa-counsel-heather-mcphee-retains-counsel-for-potential-whistleblower-claim
[11] *Id.*

127. On January 14, 2025, the presiding arbitrator issued a 61-page decision. The arbitration decision was not confidential per the terms of the Collective Bargaining Agreement ("CBA").[12]

128. While the decision ultimately found in favor of the NFL, it included powerful findings favorable to the players. It cited emails and texts among the Commissioner, the NFL's general counsel, and team owners wherein the NFL gave guidance that owners should avoid offering fully guaranteed player contracts. The arbitrator explicitly found that the NFL encouraged teams to collude, and the decision quoted congratulatory texts exchanged by team owners for avoiding fully guaranteed contracts.

129. Ms. McPhee reviewed the decision on January 15, 2025. Considering the strength of the collusion evidence and the NFLPA's obligation to act in the best interest of its members, Ms. McPhee assumed the NFLPA would quickly appeal the decision to the independent three-member panel.

130. Ms. McPhee was surprised to learn in March 2025, at the Annual Meeting of the Board of Representatives, that the NFLPA still had not appealed. She was equally shocked to learn that the NFLPA, Howell, DePaso, and outside counsel had agreed with the NFL to keep the powerful 61-page decision hidden from all NFL players, i.e., the union members they represented.

131. Ms. McPhee was stunned when she learned that not even the three quarterbacks who went through the arbitration proceeding received a copy of the decision.

[12] Article 15, Section 10 of the CBA states, in relevant part, "Unless the parties agree otherwise, proceedings before the System Arbitrator and Appeals Panel, *other than their decisions*, shall be confidential[.]" (emphasis added).

132. By June 24, 2025, media reported on the collusion decision, focusing on what Ms. McPhee was so concerned about: the NFLPA had kept the decision a secret for almost six months.

133. On June 24, 2025, reporter Pablo Torre released what he called "The 'Holy Grail' of NFL Secrets"—the full, 61-page arbitration decision.[13]

134. Reporter Mike Florio asked in his June 24 NBC Sports article, "why would the NFL Players Association not trumpet this ruling?"[14] Florio's reporting echoed some of Ms. McPhee's reaction: "The union should have been shouting it from the rooftops. They've finally proved that which had been suspected for years – that the quarterly meetings are (as former NFLPA executive director DeMaurice Smith calls them) 'collusion meetings.' The details are unprecedented, and the takeaway is unmistakable."[15]

135. ESPN reported that players did not understand why the union hid the decision; the NFL and the union should not conspire to hide information from the players; and the NFLPA Executive Director has a duty to protect the best interests of the NFLPA members.[16] Ms. McPhee shared those concerns, and was deeply troubled that union members were denied bargaining power.[17]

---

[13] https://www.pablo.show/p/the-holy-grail-of-nfl-secrets
[14] https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/why-did-the-nfl-and-nflpa-hide-the-collusion-ruling
[15] *Id.*
[16] https://www.espn.com/nfl/story/_/id/45703132/nflpa-nfl-agreed-keep-collusion-findings-secret
[17] Some media speculated that the agreement by Howell, DePaso, and outside counsel to keep the decision from players was partially motivated by a desire to "protect" the reputation of former NFLPA President JC Tretter, who had participated in the case and shared text messages in discovery. In fact, Ms. McPhee knew that Tretter had not seen the decision, and the decision did not quote his text messages. Tretter did not participate in the decision to keep the arbitrator's opinion from union members for over six months.

136. Meanwhile, at the NFLPA, instead of focusing on the real issue—the NFLPA's failure to act in the best interest of its members—DePaso tried to move the focus to the alleged leaker. DePaso scapegoated Ms. McPhee, wrongfully accusing her of leaking the decision to the media.

137. Eventually, in the wake of this public scrutiny, the NFLPA appealed the arbitration decision. Ms. McPhee asked DePaso about the timing of the appeal and DePaso, who was visibly upset, criticized Ms. McPhee for "being emotional."

138. Upon information and belief, DePaso has not criticized any male NFLPA lawyer for "being emotional."

139. Ms. McPhee was disturbed by the NFLPA decision-makers choosing to cater to Howell's demands for secrecy over advancing their clients' interests.

140. Players were harmed by the NFLPA hiding the arbitration decision for half a year. For example, players who were free agents in March 2025 could have leveraged the decision in negotiations for more favorable terms. The NFLPA denied them that opportunity.

141. Ms. McPhee continued to ask questions related to the impact of hiding the collusion decision from the union members.

142. Ms. McPhee was informed that DePaso made a comment that Ms. McPhee "was making trouble."

143. [redacted] A union must enforce all union members' CBA rights, and the agreement [redacted]

[redacted]

144. Upon information and belief, outside counsel for the NFLPA in the arbitration reached out to former NFLPA Executive Director Smith to discuss the issues Ms. McPhee raised. Outside counsel complained to Mr. Smith that Ms. McPhee's analysis of potential exposure to the NFLPA from its burial of the collusion decision was overzealous and that any claims would be frivolous. Mr. Smith disagreed. He suggested that outside counsel listen to Ms. McPhee, who had served as the NFLPA's risk expert for sixteen years, fourteen of which were under Mr. Smith's leadership.

## V. The NFLPA Exploits the Appointment of its Interim Executive Director by Using the Transition as an Opportunity to Retaliate Against Ms. McPhee

145. The NFLPA's selection process for Howell as Executive Director was unprecedented in its secrecy.

146. Historically, and as required by its constitution, the NFLPA Board would receive the list of Executive Director finalists at least 30 days before the vote, enabling Board members to perform due diligence, research, and prepare questions for finalists. But in the lead-up to Howell's selection, there was an ill-advised, successful effort to amend the constitution to remove that requirement.

147. And so, in Howell's selection process, the Board received the list just before the vote. On June 28, 2023, the Board selected Howell as the NFLPA's Executive Director.

148. After Howell's selection, alarming details began to emerge. In July 2023, just weeks after Howell's election, it was reported that Booz Allen paid the government $377 million—one of the largest procurement fraud settlements in history—for conduct that occurred under Howell's watch as Booz Allen Chief Financial Officer.

149. Ms. McPhee identified this as an issue that required escalation and reported the issue to DePaso.

150. In August 2024, the NFL announced that the Carlyle Group had been approved to invest in an NFL team.

151. At that time, Howell was an Operating Executive for the Carlyle Group. In February 2025, at the NFLPA Super Bowl Conference, Howell spoke about his role in the Carlyle Group.

152. Ms. McPhee identified this as a conflict of interest and immediately reported the issue to DePaso and Howell.

153. Later, on or about July 17, 2025, ESPN reporters called Howell asking for comment on a story that would run the next day reporting on his strip club spending expensed to the NFLPA and his history of the same conduct at Booz Allen.

154. That same day, Howell informed the EC that he was resigning, effective immediately.

155. DePaso—with knowledge of Ms. McPhee's witness status in the DOJ and grand jury investigations—excluded Ms. McPhee from meeting with the EC or the Board after Howell's resignation. That purposeful, continued isolation of Ms. McPhee allowed DePaso to continue to cast aspersions on Ms. McPhee with player leadership by suggesting she leaked the arbitration decision. With Ms. McPhee excluded from meetings, DePaso was free to disparage her with impunity.

156. On August 3, 2025, the NFLPA announced David White as its Interim Executive Director. White had been passed over for Howell in the NFLPA's prior search for an Executive Director in 2023.

157. Ms. McPhee was concerned about the NFLPA's selection of White as its Interim Executive Director. Because DePaso had banned her from meetings with the Board or the EC, she reached out to DePaso to discuss her concerns. He did not respond.

158. After White was selected, Ms. McPhee emailed him to introduce herself as the internal risk management and compliance expert and to provide a summary of serious issues facing the NFLPA. She asked to meet with him to discuss the issues.

159. White responded to Ms. McPhee and scheduled an hour-long meeting with her for August 13.

160. Upon information and belief, Curtin, DePaso, and the NFLPA President Jalen Reeves-Mayben learned that Ms. McPhee had a meeting scheduled with White. They were dead set on not letting that meeting happen.

161. DePaso, Curtin, Reeves-Mayben, Sansiveri, and others, saw the Executive Director transition as an opportunity to develop and execute a plan to remove Ms. McPhee, who they had described as "a problem," "an overzealous, intense" woman, and a media "leak."

162. At 10 a.m. on August 12, 2025, Ms. McPhee had a Teams meeting with Chief Operating Officer Teri Smith and Director of Human Resources Kimberly Murray. Ms. McPhee told Ms. Smith and Ms. Murray about DePaso's conduct towards her over the past several months, including barring her from meetings and withholding information from her. Ms. McPhee suggested that instead of reporting directly to DePaso, she report directly to Ms. Smith. Ms. Smith and Ms. Murray validated Ms. McPhee's concerns and recommended that Ms. McPhee write up her concerns and reasons for the change in reporting structure to present to White for approval; Ms. McPhee agreed to write an email laying that out.

163. On August 12, 2025, in the early afternoon, White's office emailed Ms. McPhee to tell her that White's schedule had changed and to ask if Ms. McPhee could reschedule her August 13 meeting to August 12 at 4:30 p.m. Ms. McPhee agreed and emailed White to let him know that she had not yet finished the binder of materials she was preparing for their meeting and that she looked forward to meeting him. [redacted]

### VI. The NFLPA Retaliates Against Ms. McPhee with Pretextual Allegations and Places Her on Administrative Leave

164. When Ms. McPhee arrived at her meeting with White, Ms. Murray and another HR staff member were also there. White—who had been at the helm of NFLPA for mere days—handed Ms. McPhee a memorandum. Ms. McPhee was stunned.

165. The memorandum was titled, "Notice of Paid Administrative Leave," ("Leave Memo") and was issued to her by White, copying outside counsel. It contained vague allegations of complaints about Ms. McPhee's "workplace behavior" including "allegations of abusive, disrespectful, and/or bullying conduct, including toward [Ms. McPhee's] managers, Executive Committee members and colleagues[.]"

166. The Leave Memo further alleged nonspecific "other potential violations of [Ms. McPhee's] Employment Agreement or other misconduct." The generally alleged "other misconduct" included "refusing to follow job-related instructions from [Ms. McPhee's] direct manager; failing to perform [Ms. McPhee's] duties and responsibilities in an appropriate, trustworthy, and respectful manner; and failing to comply with relevant NFLPA policies and procedures."

167. The Leave Memo included no details about who made the alleged complaints, what the substance of the complaints was, what specific policies Ms. McPhee was alleged to

have violated, when the alleged misconduct occurred, or where the alleged misconduct took place.

168. The Leave Memo further informed Ms. McPhee that she was being placed on paid administrative leave and that, during that time, the NFLPA forbade her from entering its offices, performing any work for the NFLPA, or initiating contact with any "NFLPA employee, Executive Committee member, Board member, any other union members, Former Player members, and/or any employee or Board member of the Trust, NFL Players Inc., or the Professional Athletes Foundation."

169. Ms. McPhee asked White, repeatedly, who made the allegations against her, what alleged conduct amounted to bullying, and what directions DePaso claimed she did not follow. White did not answer any of her questions.

170. Before leaving the NFLPA's office on August 12, Ms. McPhee was required to turn in her NFLPA laptop and immediately lost access to her work documents, email, and internal systems.

171. During the meeting, the NFLPA's Information Technology department remotely removed work applications from Ms. McPhee's personal phone.

172. Upon information and belief, Ms. Smith, the Black, female Chief Operating Officer who had oversight of the NFLPA's Human Resources, was not informed or consulted prior to the ambush meeting with Ms. McPhee. Then, just days later, White told Ms. Smith that she (Smith) was being stripped of her oversight of Human Resource and Information Technology.

173. Upon information and belief, Ms. Murray, the Black, female Director of Human Resources, was also not informed or consulted prior to the ambush meeting with Ms. McPhee.

A. <u>The NFLPA Leaks the Leave Memo</u>

174. By August 14, 2025, Ms. McPhee's Leave Memo was leaked to ESPN.[18]

175. Ms. McPhee was not the source of this leak.

176. Recognizing the clearly retaliatory nature of the investigation into Ms. McPhee, NBC Sports reported that "[t]he NFLPA will need to have plenty of evidence and documentation to show this move isn't a pretext for retaliation."[19]

177. ESPN reported that, based on five sources, the NFLPA put Ms. McPhee on paid administrative leave and that she "was the subject of complaints alleging her failure to follow supervisors' directions as well as allegations of bullying colleagues and disrupting the union's work environment."[20]

178. ESPN identified the head of NFLPI, Matt Curtin, as someone who filed a complaint against Ms. McPhee.[21]

179. Around the same time, Curtin bragged to OTP personnel about "ordering the Code Red on Heather." By "ordering the Code Red," Curtin put in motion a pretextual, discriminatory, and retaliatory investigation into Ms. McPhee. Curtin was committed to the plan to remove Ms. McPhee from the NFLPA, no matter what it took.

---

[18] https://www.espn.com/nfl/story/_/id/45983157/nflpa-puts-lawyer-allegations-led-fbi-probe-leave-sources-say

[19] https://www.nbcsports.com/nfl/profootballtalk/rumor-mill/news/report-nflpa-puts-in-house-counsel-heather-mcphee-on-paid-leave

[20] https://www.espn.com/nfl/story/_/id/45983157/nflpa-puts-lawyer-allegations-led-fbi-probe-leave-sources-say

[21] *Id.*

B. The NFLPA Refuses to Provide Ms. McPhee with Any Details of the Vague Allegations Against Her

180. Ms. McPhee, through her counsel, sought information from the NFLPA's counsel for details about the allegations against her.

181. Counsel for Ms. McPhee asked NFLPA counsel, repeatedly, for the substance of any complaints against Ms. McPhee, including the one by Curtin.

182. Counsel also asked for copies of Ms. McPhee's Employment Agreement, the NFLPA Employee Handbook, and any other policies or procedures she was alleged to have violated. The NFLPA held those documents hostage for weeks, demanding that Ms. McPhee first turn over her personal cell phone for the NFLPA to image, in full.

183. The NFLPA's demand for unfettered access to Ms. McPhee's personal cell phone is unprecedented. Never before has the NFLPA demanded that an employee make the entire contents of his personal cell phone available for an investigation.

184. Nevertheless, in good faith cooperation with the investigation, Ms. McPhee provided her phone to a third-party vendor to image and to search. Ms. McPhee even agreed to split the cost of the vendor with the NFLPA.

C. The NFLPA's Unprecedented, Retaliatory, and Discriminatory Treatment of Ms. McPhee Makes Ms. McPhee's Participation in an Interview as Part of the NFLPA's Investigation Impossible

185. On October 24, 2025, counsel for the NFLPA requested an interview with Ms. McPhee. Counsel for Ms. McPhee responded that she would participate in the interview if the NFLPA would provide details about the basic who, when, and what of the complaints against Ms. McPhee. Absent those details, the interview would be a bad faith free-for-all, where the NFLPA could conduct a fishing expedition and further intimidate and discriminate against Ms. McPhee.

186. In response, counsel for the NFLPA warned that it "may draw adverse inferences from Ms. McPhee refusing to cooperate, specifically including her refusing to respond to questions and provide basic information."

187. When the NFLPA continued to withhold even basic details from Ms. McPhee, counsel for Ms. McPhee alerted the NFLPA's counsel that Ms. McPhee could not sit for an interview. The NFLPA's conduct reflected a willful and bad-faith obstruction of what should have been a transparent and orderly process.

188. Counsel for the NFLPA indicated that it would complete its investigation without speaking with Ms. McPhee and that Ms. McPhee should submit any additional information by November 26.

189. On November 26, Ms. McPhee submitted to the NFLPA a written explanation of why she could not subject herself to an interview where the NFLPA would further intimidate, retaliate, and discriminate against her. She explained why, under these circumstances, no adverse inferences should be drawn from her nonparticipation.

190. Ms. McPhee detailed the NFLPA's actions that highlight its pretextual and bad faith motives including: the NFLPA's refusal to share details about the allegation; the NFLPA's unprecedented demand for access to her phone; and the NFLPA's failure to follow through on its commitments.

191. Ms. McPhee also detailed her own efforts to cooperate with the investigation until cooperation became untenable including: splitting the cost of imaging and searching her personal cell phone; searching her phone for message with people identified by the NFLPA; and producing some of those messages.

192. The NFLPA's actions against Ms. McPhee—a senior, female employee—are unprecedented. In 2021, a senior male employee was investigated [redacted] Unlike Ms. McPhee, he was never placed on administrative leave, there was no demand to image his phone, and he was not cut off from access to his professional colleagues and friends. Instead, he was simply reprimanded and told that he should delinquently file LM-30 reports; he was never ordered to disgorge the six-figure sum he received [redacted]

193. As publicly reported in 2022, a senior male NFLPA employee was investigated for a "wide-ranging set of allegations against [that] accused [male employee]" of being "toxic" and "abusive," particularly toward women.[22] "More than a half-dozen current and former NFLPA employees" told media that "they directly witnessed [the male employee] making belittling or inappropriate remarks to women who worked under him."[23] [redacted]. Reporting detailed that the male employee "got drunk and got into an argument with [then-Executive Director] Smith in front of at least one player that was so loud people present were astonished he kept his job."[24] Unlike Ms. McPhee, he was never put on leave, there was no demand to image his personal cell phone, and there was no edict that severed his access to his professional colleagues and friends. He remained as a senior executive until his departure in 2024.

---

[22] https://www.vice.com/en/article/nfl-players-union-investigating-claims-of-misconduct-made-against-senior-official/.
[23] *Id.*
[24] *Id.*

## VII. Ms. McPhee Has Been Harmed by the NFLPA's Unprecedented, Retaliatory, and Intimidating Conduct

194. The NFLPA's unprecedented actions against Ms. McPhee isolated her and restricted her access and interactions with her professional colleagues, many of whom are her close friends.

195. After sixteen years of service with the NFLPA, the inflammatory, hurtful, and embarrassing allegations that Curtin, a senior executive for the labor organization, and others shared with media have had a serious, physical impact on Ms. McPhee.

196. It is well-known among Ms. McPhee's NFLPA colleagues, including DePaso, that Ms. McPhee has a decades-long struggle with anorexia, which includes extreme exercise and restricted eating.

197. For recovering anorexics like Ms. McPhee, every day is a battle to manage behaviors to avoid extreme physical harm. Up until the NFLPA's discriminatory, intimidating, and retaliatory actions against her, Ms. McPhee was managing those behaviors well.

198. The NFLPA's conduct toward her has caused immense emotional pain, stress, and embarrassment which have compounded and, unfortunately, reignited her anorexic behaviors. Ms. McPhee has sought medical care to address these behaviors and resulting harms.

## VIII. The NFLPA Has Not Reimbursed Ms. McPhee for Her Attorneys' Fees in Connection with the DOJ and Grand Jury Investigations

199. In Section 5 of her Employment Agreement, the NFLPA promised Ms. McPhee that "[t]he NFLPA will indemnify the Employee for and defend the Employee from claims or demands arising from the Employee's good faith performance of their duties as an employee of the NFLPA." In mid-2025, the DOJ contacted Ms. McPhee regarding a Department investigation. The DOJ explained that it was investigating certain conduct of executives of the

NFLPA and at least one of its affiliates. It further explained that the DOJ understood that Ms. McPhee was a potential witness to the potential wrongdoing of the executives; she was *not* a target or subject of the Department investigation.

200. Upon information and belief, the DOJ had convened a grand jury in connection with its investigation into the NFLPA.

201. Ms. McPhee retained personal counsel in connection with the investigations. She has paid each of the invoices from counsel herself.

202. The DOJ and grand jury investigations placed demands on Ms. McPhee's time and resources that arose solely because of her good faith performance of her duties as an NFLPA employee.

203. Accordingly, in August 2025 and subsequently, Ms. McPhee sought indemnification by the NFLPA for her legal fees and costs incurred in connection with the DOJ and grand jury investigations.

204. Before seeking indemnification, Ms. McPhee discussed the appropriateness of indemnification with, among others, her boss, NFLPA General Counsel Tom DePaso.

205. On information and belief, DePaso and others have sought indemnification from the NFLPA for their legal fees and costs incurred in connection with the DOJ and grand jury investigations (and the associated internal investigation).

206. Many months after submitting her first request for reimbursement, Ms. McPhee has yet to receive any indemnification, notwithstanding her various follow-up requests.

207. The NFLPA has constructively denied reimbursement to Ms. McPhee, thereby breaching its obligation to provide that indemnification.

**FIRST CAUSE OF ACTION**
***Obstruction of Justice, 42 U.S.C. § 1985(2)***
**(Against All Defendants)**

208. Ms. McPhee incorporates and realleges paragraphs 1 through 207 as if fully set forth herein.

209. 42 U.S.C. § 1985(2) prohibits "two or more persons" from "conspir[ing] to deter by force, intimidation, or threat, any . . . witness in any court of the United States from . . . testifying to any matter pending therein, freely, fully, and truthfully[.]"

210. Ms. McPhee is a crucial witness with knowledge of the activities at the center of the ongoing investigations being conducted by the DOJ and a federal grand jury into the conduct of certain NFLPA/NFLPI executives relating to OTP.

211. Defendants and others, including Sansiveri, were aware, or reasonably believed, that Ms. McPhee intended to provide and/or was likely to provide information, as appropriate, concerning the conduct of certain NFLPA/NFLPI and OTP executives relating to, at least, OTP to federal law enforcement officers, DOJ officials, and the grand jury concerning the matters under investigation.

212. Defendants and others, including Sansiveri, knowingly agreed and conspired to deter, intimidate, and threaten Ms. McPhee with the intent to influence, delay, or prevent Ms. McPhee from testifying before the DOJ and grand jury investigations, and/or cause or induce Ms. McPhee to withhold testimony, records, documents, or other information from the DOJ and grand jury.

213. Defendants and others, including Sansiveri, took several overt actions in furtherance of the conspiracy, including, but not limited to, placing Ms. McPhee on administrative leave, filing complaints against Ms. McPhee, excluding her from meetings with

the NFLPA Board and Executive Committee, disparaging her to NFLPA employees and leadership, constructively denying her requests for indemnification, and conducting a bad-faith investigation about her advocacy for the union members.

214. After learning about her role as a witness in the DOJ and grand jury investigations, Defendants stated that Ms. McPhee was "not on our team," was "a problem," and that they will "deal with her." One later bragged about "ordering the Code Red on Heather."

215. The foregoing actions, communications, and coordinated steps by Defendants and others, including Sansiveri, acting in concert, were intended to deter, intimidate, and threaten Ms. McPhee from providing information and testimony as a witness regarding matters under the DOJ and grand jury investigations.

216. Defendants' conduct occurred after the initiation of the investigations by the DOJ and grand jury, at times when Defendants knew or had reason to know that Ms. McPhee had been requested to provide information in those proceedings.

217. As a direct and proximate result of Defendants' conspiracy to deter, intimidate, and threaten Ms. McPhee in violation of 42 U.S.C. § 1985(2), Ms. McPhee has suffered damages, including but not limited to emotional distress, reputational harm, and other consequential injuries, in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
***Sex Discrimination in Violation of the D.C. Human Rights Act, D.C. Code § 2-1401* et seq.**
**(Against All Defendants)**

218. Ms. McPhee incorporates and realleges paragraphs 1 through 207 as if fully set forth herein.

219. The D.C. Human Rights Act ("DCHRA") prohibits an employer from discriminating against any individual with respect to terms, conditions, or privileges of employment because of sex.

220. Ms. McPhee is a woman; she a member of a protected class under the DCHRA. She has served as Associate General Counsel of the NFLPA since August 11, 2009, and she is the senior female attorney at that organization.

221. Defendants subjected Ms. McPhee to adverse actions, including: instructing her to cease working on core aspects of her portfolio and threatening her with employment consequences if she failed to comply; excluding her from communications and meetings with the NFLPA Executive Committee and Board; placing her on paid administrative leave; cutting off her access to the workplace, colleagues, and systems; and initiating a pretextual investigation premised on vague, unspecified allegations.

222. Defendants treated Ms. McPhee less favorably than similarly situated male employees in similar circumstances. In 2021, a senior male employee investigated [redacted] was not placed on administrative leave, was not required to provide unfettered access to a personal device, and was not cut off from colleagues; he was reprimanded and directed to make delinquent filings and was not required to disgorge the six figure payments he and his business entities received. In 2022, another senior male employee faced a wide-ranging set of allegations, including that he was "toxic" and "abusive," particularly toward women, [redacted] he likewise was not put on leave, was not required to image a personal device, was not isolated from colleagues, and remained a senior executive until his 2024 departure.

223. Defendants used sex-based stereotypes to undermine Ms. McPhee. DePaso criticized her for "being emotional," and for "making trouble." Upon information and belief, DePaso has not used this language to criticize any male NFLPA lawyers.

224. Defendants marginalized Ms. McPhee through gendered disparagement and exclusion that undercut her authority and access, including remarks that she was "intense," "overzealous," and "a problem," and by replacing her with a less experienced male attorney in communications with the Executive Committee and Board on matters squarely within her expertise.

225. The NFLPA's asserted reasons for the adverse actions are pretextual. The Leave Memo cited vague, nonspecific allegations of "abusive, disrespectful, and/or bullying conduct" and "other potential violations" without identifying the who, what, when, or where of any alleged misconduct. When Ms. McPhee asked for details about the allegations to prepare for an interview and otherwise cooperate with the investigation, the NFLPA refused to provide them. The NFLPA demanded unprecedented access to her personal device, and cut off her access to her professional colleagues and friends.

226. Ms. McPhee's sex was a motivating factor in the NFLPA's adverse actions and disparate treatment, as reflected by sex-based stereotyping, more favorable treatment of similarly situated male employees, and the pattern of exclusion and escalation applied uniquely to Ms. McPhee.

227. As a direct and proximate result of the NFLPA's unlawful discrimination, Ms. McPhee has suffered, and continues to suffer, damages including, but not limited to, lost earnings and benefits, loss of professional opportunities, reputational harm, and emotional distress, in amounts to be determined at trial.

**<u>THIRD CAUSE OF ACTION</u>**
***Intentional Infliction of Emotional Distress***
**(Against All Defendants)**

228. Ms. McPhee incorporates and realleges paragraphs 1 through 207 as if fully set forth herein.

229. Defendants engaged in extreme and outrageous conduct directed at Ms. McPhee, including: ostracizing her from her professional colleagues and friends; ordering a "Code Red" on her; manufacturing a pretextual, discriminatory, and retaliatory investigation into her; and disparaging her both within and outside of the NFLPA.

230. Defendant's conduct was undertaken intentionally and/or with reckless disregard of the near certainty that such conduct would cause Ms. McPhee severe emotional distress, including through statements by senior officials identifying Ms. McPhee as "a problem" that they would "deal with," and boasting about "ordering the Code Red on Heather." The NFLPA, including DePaso, was aware of Ms. McPhee's decades-long struggle with anorexia, including her extreme exercise and restricted eating.

231. Up until the NFLPA's intimidating, retaliatory, and discriminatory actions towards her, Ms. McPhee was managing her anorexia-related behaviors well. Defendants were aware of Ms. McPhee's decades-long struggle with anorexia and the effect that undue stress has on her.

232. Defendants' extreme and outrageous conduct was the direct and proximate cause of Ms. McPhee's emotional harm, including harms exacerbated by anorexia-related behaviors. The NFLPA's actions foreseeably and actually resulted in Ms. McPhee's humiliation, reputational harm, isolation from professional colleagues and player leadership, and significant distress.

233. As a result, Ms. McPhee suffered severe emotional distress, including humiliation, embarrassment, anxiety, and anguish, and continues to suffer such distress, for which she is entitled to recover compensatory damages, in an amount to be determined at trial.

**FOURTH CAUSE OF ACTION**
***Breach of Contract***
**(Against the NFLPA)**

234. Ms. McPhee incorporates and realleges paragraphs 1 through 207 as if fully set forth herein.

235. Ms. McPhee and the NFLPA are parties to a valid and enforceable Employment Agreement.

236. Section 5 of the Employment Agreement states that "[t]he NFLPA will indemnify the Employee for and defend the Employee from claims or demands arising from the Employee's good faith performance of their duties as an employee of the NFLPA."

237. In mid-2025, the DOJ contacted Ms. McPhee regarding its investigation into certain executives at the NFLPA and at least one of its affiliates; DOJ advised Ms. McPhee that she was a witness and not a target or subject.

238. The DOJ and grand jury investigations imposed demands on Ms. McPhee's time and resources that arose solely because of her good-faith performance of her duties as an NFLPA employee.

239. Ms. McPhee retained personal counsel in connection with the investigations. She has paid each of those invoices from counsel herself.

240. Beginning in or about August 2025 and on multiple occasions thereafter, Ms. McPhee sought indemnification from the NFLPA for legal fees and costs incurred in connection

with the DOJ and grand jury investigations, as well as work associated with the NFLPA's internal investigation.

241. Despite the clear indemnification obligation in the Employment Agreement and Ms. McPhee's repeated requests, many months have elapsed since Ms. McPhee's first request, and the NFLPA has failed to indemnify Ms. McPhee for any of her fees and costs, thereby constructively denying reimbursement.

242. The NFLPA breached the Employment Agreement by failing and refusing to indemnify and defend Ms. McPhee for claims or demands arising from her good-faith performance of her duties as an NFLPA employee, including the legal fees and costs incurred in connection with the DOJ and grand jury investigations and related internal investigation.

243. As a direct and proximate result of the NFLPA's breach, Ms. McPhee has suffered damages in an amount to be proven at trial, including but not limited to unreimbursed legal fees and costs, consequential losses, and other contract damages.

## **RELIEF REQUESTED**

WHEREFORE, as to all claims, Ms. McPhee seeks judgment against Defendants as follows:

1. That the Court award Ms. McPhee compensatory damages in an amount to be determined at trial, but in no event less than $10,000,000 (including lost past and future compensation, lost earning potential, and compensation for her humiliation, embarrassment, and emotional distress);

2. That the Court award Ms. McPhee punitive damages to punish and penalize Defendants and deter them from repeating its unlawful conduct;

3. That the Court order the NFLPA to terminate McPhee's administrative leave and allow her to resume her full employment duties as Associate General Counsel;

4. That the Court award Ms. McPhee all fees and costs, including attorney's fees, incurred in the prosecution of these claims;

5. That the Court order the NFLPA to reimburse McPhee for all fees and costs, including attorney's fees, incurred in connection with the DOJ and the grand jury investigations;

6. That the Court award pre and post-judgment interest; and

7. That the Court grant such other and further relief as the Court deems just and appropriate.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Ms. McPhee demands a trial by jury.

Dated: December 18, 2025

Respectfully submitted,

*/s/ Courtney R. Forrest*
Courtney R. Forrest (D.C. Bar No. 996740)
Sarah R. Fink (D.C. Bar No. 166663)
Kaiser PLLC
1099 14th Street, NW, 8th Floor West
Washington, D.C. 20005
Tel: (202) 640-2850
cforrest@kaiserlaw.com
sfink@kaiserlaw.com

*Attorneys for Plaintiff Heather McPhee*